RECEIVED
JUL 14 2006
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| TERRY J. MIGUEZ | CIVIL ACTION NO. 05-0732 |
| VS. | |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION | MAGISTRATE JUDGE METHVIN BY CONSENT OF THE PARTIES |

## MEMORANDUM RULING

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, the court concludes that there is not substantial evidence to support the ALJ's finding. Accordingly, the Commissioner's decision is **REVERSED** and the case is **REMANDED** for further administrative proceedings.

### *Background*

Born on December 22, 1951, Terry Miguez ("Miguez") is currently 54 years old. Miguez has a high school education and attended college for over a year. He has worked in the past as a construction laborer, oilfield worker, and carpenter's helper. On May 12, 2004, Miguez applied for disability benefits and SSI effective June 1, 1999, due to major depression, neck and back problems.[1] Miguez's applications were denied on initial review, and an administrative hearing was held on December 15, 2004.[2] In an opinion dated January 19, 2005, the ALJ denied benefits on grounds that, absent substance abuse, Miguez retained the capacity to a significant range of

---

[1] Tr. 55.

[2] Tr. 176-196.

light work, and therefore, he was not disabled.[3] The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner from which Miguez now appeals.

## *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

A person applying for disability and/or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act, 43 U.S.C. §423(d). Initially, the burden is on the claimant to show that he cannot perform his previous work. Fraga v. Bowen, 810 F.2d 1296, 1301 (5th Cir.1987); Anthony, 954 F.2d at 293. Once the claimant satisfies his initial burden, the Secretary then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is therefore not disabled. Fraga, 810 F.2d at 1301-

---

[3] Tr. 11-19.

1302; Johnson v. Bowen, 864 F.2d 340, 344 (5th Cir.1988). In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

When a mental disability claim is made, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, § 404.1520a(e) provides that the ALJ must document his application of this technique to the claimant's mental impairments.

Satterwhite v. Barnhart, 44 Fed.Appx. 652 (5th Cir. 2002) (unpublished).[4]

### *ALJ's Findings*

The ALJ determined that Miguez's spondylolisthesis, personality disorder, and substance abuse were severe.[5] The ALJ assessed Miguez's residual functional capacity ("RFC") and concluded that, with the presence of alcohol, he retained the RFC to perform light work, but that because of his personality disorder and drug abuse, he was limited to performing simple one-two-three step tasks, he must avoid excessive job stress, and he was unreliable in his ability to complete an 8-hour workday or 40-hour workweek.[6] The ALJ found that Miguez cannot return to his past work, nor can he make an adjustment to any work existing in the national economy. Accordingly, the ALJ found Miguez to be disabled. Noting Miguez's substance abuse problems, the ALJ went on to apply Public Law 104-121 to his case and determined that, because drug abuse is a material factor in the determination of his disability, he is not entitled to benefits. In so finding, the ALJ concluded that absent substance abuse, Miguez could perform a significant

---

[4] For a succinct summary of the current law, see Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004):

1. The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he or she has a medically determinable mental impairment.
2. If a medically determinable mental impairment is found, the ALJ must then rate the degree of functional limitation resulting from the impairment in four areas: (1) activities of daily living; (2) social functioning; (3) persistence or pace of concentration; and (4) episodes of decompensation. See C.F.R. §404.1520a(c)(3).
3. When a severe mental impairment is found, the Commissioner determines whether the impairment meets or exceeds the requirements of the Listings.
4. When the severe mental impairment does not meet Listing requirements, the Commissioner then assesses the claimant's residual functional capacity.

The procedure states that if the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, *unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities.* Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1).

[5] Tr. 13.

[6] Tr. 18.

range of light work which exist in substantial numbers in the national and local economies, and therefore, he would not be disabled.[7]

*Assignment of Errors*

Miguez alleges that the ALJ erred in the following respects: 1) in finding that he does not meet the requirements of either Listing 12.04, 12.08, or 12.09;[8] and 2) in finding that he can maintain employment.

*Findings and Conclusions*

After a review of the entire record and the briefs of the parties, and pursuant to 42 U.S.C. § 405(g), the court concludes that the ALJ's findings and conclusions are not supported by substantial evidence in the record.

**Administrative Record**

Miguez has had a long history of mental health problems. An "Episodes of Care" report by the Louisiana Office of Mental Health included in the Crowley Mental Health Center records shows that as early as 1996, Miguez was diagnosed with recurrent moderate major depression[9] and in 1999, he was diagnosed with recurrent severe major depression with severe psychotic features.[10]

---

[7] Tr. 19.

[8] In Miguez's rebuttal brief, he argues that he may also meet the listing requirements of 12.05(C). Listing 12.05(C) concerns mental retardation and requires proof of IQ scores, which are not contained in the record. Miguez mistakenly refers to his GAF score as meeting the requirements of this impairment.

[9] Tr. 144. "Primary Diagnosis, 296.32." *See* http://www.dr-bob.org/tips/dsm4a.html

[10] Tr. 144. "Primary Diagnosis, 296.34."

Specifically, on January 5, 1999, Miguez was admitted to University Medical Center ("UMC") because of suicidal thoughts and depression.[11] Miguez was discharged on February 22, 1999, with a diagnoses of major depressive episode, recurrent, and opioid use dependence.[12]

On September 9, 2001, Miguez was examined at UMC, complaining of depression and that his "meds are not working."[13] Miguez stated that he was homeless and he had thoughts of committing suicide by jumping in front of a car.[14] He was compliant with his medication regimen, which consisted of lithium[15], trazodone[16], diphenhydramine[17], haloperidol[18], sertraline[19] propranolol[20] and levothyroxine[21]. Miguez denied using alcohol and illicit drugs.[22] Miguez was transferred to Tyler Mental Health Center ("Tyler Center") for in-patient treatment.[23]

---

[11] Tr. 72-75.

[12] Tr. 74.

[13] Tr. 77.

[14] Tr. 77, 79, 81.

[15] Used to treat manic-depression. *See* http://www.drugs.com/mtm/lithium.html

[16] Used to treat depression. See http://www.trazadone.net/

[17] An antihistamine. See http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682539.html

[18] An anti-psychotic medication. See http://www.drugs.com/mtm/haloperidol.html

[19] An anti-depressant. *See* http://www.drugs.com/mtm/sertraline.html

[20] Beta blocker used to treat tremors and heart problems. See http://www.drugs.com/inderal.html

[21] Used to regulate enlarged thyroid gland. See http://www.drugs.com/mtm/levothyroxine.html

[22] Tr. 77.

[23] Tr. 81. Although the UMC records refer to a transfer to New Orleans Charity Hospital, the administrative record shows that in fact, on September 10, 2001, Miguez was admitted to the Tyler Center for in-patient treatment. Tr. 87.

Miguez was admitted into the Tyler Center on September 10, 2001 and discharged on October 1, 2001.[24] Miguez complained of auditory hallucinations that command him to harm himself.[25] Miguez had impaired sleep and depressed mood. Miguez claimed to not have used drugs for three years.[26] He reported having been treated for mental problems since he was 20 years old.[27] After in-patient treatment, Miguez continued to have suicidal ideation, however he did not have a plan or intent to carry through with the thoughts.[28] He still had some depressed mood and had paranoid delusions.[29] He was diagnosed with major depression with psychotic features.[30]

On October 10, 2003, Miguez was examined at Crowley Mental Health Center. Miguez stated that he had recently been in jail for probation violation regarding prescription drug fraud charges.[31] He was homeless. Miguez reported several suicide attempts in the past, the last being in 2000 when he tried to overdose. He was isolated and had no motivation to interact with others. Miguez stated that he "is just existing from day to day – does not care as tomorrow."[32] He reported using drugs since he was 17 years old because the drugs made him feel normal.

---

[24] Tr. 87-90.

[25] Tr. 87.

[26] Tr. 87.

[27] Tr. 82.

[28] Tr. 87, 88

[29] Tr. 88.

[30] Tr. 89.

[31] Tr. 108.

[32] Tr. 108.

Miguez's medications were continued and he was referred for outpatient treatment at Crowley Mental Health.

From October, 2003 until May 2, 2004, Miguez underwent regular psychological therapy sessions at Crowley Mental Health.[33] Pertinent notes from some of the sessions are as follows:

| | |
|---|---|
| 11/4/03 | Patient continues to be negative. . . He denies suicidal thoughts and is medication compliant.[34] |
| 12/9/03 | He continues to stay drug free. Admits to urges. Reports that he is not happy. Feels his nerves in his brain aren't firing.[35] |
| 12/16/03 | "MJ [marijuana] has been my natural anti-depressant for 37 years." He denied suicidal plan but wishes for death.[36] |
| 12/23/06 | Continues to be drug free. |
| 12/30/03 | Patient appeared to be in a better mood than usual.[37] |
| 1/13/04 | Patient stated he had a bad few days last week. He continues to be negative, doesn't think things will ever change. "My highlight for the week is this session."[38] |
| 2/10/04 | He continues to be more optimistic... Continues to be drug free. |
| 4/20/04 | Med. compliant. Stated that he was doing well today. He stated that this is a rare occurrence and that he usually feels depressed.[39] |

---

[33] Tr. 91-94, 126-127.

[34] Tr. 102.

[35] Tr. 101.

[36] Tr. 104.

[37] Tr. 100.

[38] Tr. 97.

[39] Tr. 96.

| | |
|---|---|
| 5/7/04 | Patient reported that he was hospitalized due to becoming very depressed. Patient presented flat affect.[40] |
| 5/12/04 | Patient recently discharged from Pauline Faulk Centre. Admits to relapse.[41] |

From April 25, 2004 to April 30, 2004, Miguez was hospitalized at Pauline Faulk Centre for Behavioral Health in Rayne, Louisiana.[42] The urine drug screen was positive for opioids and THC [cannabis].[43] The hospital course was as follows:

> The patient underwent a psychiatric medical and psychosocial assessment. Primary problems being addressed was supposedly his depression, but we started seeing more of a personality issue with primary polysubstance abuse. With his history and all that, probably dealing more with a dramatic cluster personality like antisocial personality and limited acknowledgment of his primary substance abuse problems. He stated that he took one or two Tylox before coming in to the hospital and I can assure you that would have been negative on the drug screen if it's been a couple of days in such low doses. He did very well. No significant problems. We kept him on trazodone, and Abilify. He did have some problems with blood pressure... He was alert and oriented x4 at the time of discharge. He was goal directed in his thoughts. No suicidal or homicidal ideations.[44]

The discharge diagnosis was "possibility of depression, probably antisocial personality disorder versus malingering." Miguez was instructed to continue using his medications and to seek follow-up care at Crowley Mental Health Clinic.

On August 11, 2004, Migues was examined at American Legion Hospital in Crowley, Louisiana, complaining of lower back pain. X-rays of Miguez's back showed vascular

---

[40] Tr. 96-A.

[41] Tr. 95.

[42] Tr. 150.

[43] Tr. 150.

[44] Tr. 150.

calcifications at L3-4, hypertrophic osteophytes along the anterior superior L3 vertebra, and defects in interarticularis at L5-S1 with grade I spondylolisthesis.[45]

At the administrative hearing on December 15, 2004, Miguez admitted that he had problems with illegal drugs. He testified that he had last used marijuana about a month before the hearing.[46] He also abused pain pills. He testified that he has back pain which interferes with his ability to work.[47] He stated that he has recurrent episodes of depression, he becomes very withdrawn, he goes days without sleep, and he feels nervous around people.[48] He testified that he feels that he was born depressed and he has felt bad ever since he can remember:

> [A]nd then it seems like in the sixties when I was introduced to drugs it was like an answer for me. And I continued until I went to mental health and got on antidepressants and that helped for a while but it seems like they always failed me. Either I got used to them or the depression would come back without warning and I would, I would do something stupid.[49]

He has attempted suicide by overdosing three times. He can lift a bag of groceries and sweep.[50] He does not read much because he cannot concentrate and he immediately forgets what he just read.[51]

---

[45] Tr. 147.

[46] Tr. 182.

[47] Tr. 184.

[48] Tr. 186.

[49] Tr. 188.

[50] Tr. 187.

[51] Tr. 188.

## Listings 12.04 and 12.08

Miguez maintains that the ALJ erred in finding that he does not meet the requirements of either Listings 12.04 and 12.08 because the ALJ found that he had one to two episodes of decompensation. Listing 12.04 states:

> **12.04 Affective Disorders:** Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> * * *
>
> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 CFR Pt. 404, Subpt. P, App. 1.[52]

---

[52] Listing 12.04 (A) and (B) state:

A. Medically documented persistence, either continuous or intermittent, of one of the following:
    1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions or paranoid thinking; or

Listing 12.08 provides, in pertinent part:

**12.08 Personality Disorders**: A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

* * *

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked restriction in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 CFR Pt. 404, Subpt. P, App. 1.

Miguez argues that since the ALJ found that he had one or two episodes of decompensation, he necessarily meets the final requirements in Listings 12.04(C) and 12.08(B)(4). Miguez is incorrect. The term "repeated episodes of decompensation, each of extended duration" is defined as "three episodes within 1 year, or an average of once every 4

---

        2. Manic syndrome characterized by at least three of the following:
            a. Hyperactivity; or
            b. Pressure of speech; or
            c. Flight of ideas; or
            d. Inflated self-esteem; or
            e. Decreased need for sleep; or
            f. Easy distractibility; or
            g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
            h. Hallucinations, delusions or paranoid thinking; Or
        3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); And
B. Resulting in at least two of the following:
        1. Marked restriction of activities of daily living; or
        2. Marked difficulties in maintaining social functioning; or
        3. Marked difficulties in maintaining concentration, persistence, or pace; or
        4. Repeated episodes of decompensation, each of extended duration.

Or

months, each lasting for at least 2 weeks."[53] Listing 12.00(C)(4) 20 CFR Pt. 404, Subpt. P, App. 1. Here, there is no evidence that Miguez was hospitalized or otherwise required more structured treatment due to his mental problems other than his hospitalization in January, 1999, which lasted 48 days, September, 2001, which lasted three weeks, and in April, 2004, which lasted five days. Clearly, these episodes, although they may be episodes of decompensation, are not within one year, and do not meet the requirements of "repeated episodes of decompensation, each of extended duration." Accordingly, the undersigned concludes that the ALJ did not err in finding that Miguez did not meet the requirements of a listed impairment.

## Alcohol and Disability Determination

Although not addressed by Miguez, it is clear that a central issue in this case concerns whether the ALJ properly analyzed whether Miguez's drug abuse was material to the finding that he is disabled.

The undersigned notes that the ALJ followed the proper procedure for the evaluation of a mental disability claim. The ALJ properly concluded that Miguez has the medically determinable impairments of spondylolisthesis, personality disorder, and substance abuse. At the next step, the ALJ determined that Miguez has moderate restrictions in his activities of daily living and maintaining concentration, persistence, and pace, but marked restrictions in his social functioning, and one or two episodes of decompensation.[54] The ALJ further found that Miguez

---

[53] Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 CFR Pt. 404, Subpt. P, App. 1

[54] Tr. 14.

cannot return to his past relevant work and he cannot make the adjustment to other work in the economy. Nevertheless, because the ALJ determined that Miguez's substance abuse problems are material to the finding that he is disabled, the ALJ concluded that he is not entitled to benefits.

Section 105 of the Contract with America Advancement Act of 1996, Pub.L. No. 104-121, 110 Stat. 847, 852-55 (1996), amended pertinent portions of the Social Security Act to prohibit the award of disability insurance benefits and supplemental security income benefits to individuals disabled by alcoholism or drug addiction. *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J), *cited in* Austin v. Massanari, 162 F.Supp.2d 517, 526-27 (W.D.La. 2001). Under the amended regulations, the key factor the Commissioner must examine in determining whether drugs or alcohol are a contributing factor to the claim is whether the Commissioner would still find the claimant disabled if he or she stopped using drugs or alcohol. 20 C.F.R. §416.935(b)(1). The Fifth Circuit has expressly held that the claimant bears the burden of proving that drug or alcohol addiction is not a contributing factor material to his or her disability. Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).

In the instant case, the ALJ ruled that, if Miguez stops taking drugs he would have mild restrictions of activities of daily living, moderate difficulties maintaining social functioning, concentration, persistence, or pace for complex tasks and no episodes of decompensation of extended duration.[55] Further, the ALJ found that without drug abuse, Miguez could perform a significant range of light work which exists in substantial numbers in the economy.

As discussed above, the ALJ's decision must be supported by substantial evidence. An ALJ may not "pick and choose" only that evidence which supports his decision, but must address and make specific findings regarding the supporting and conflicting evidence, the

---

[55] Tr. 15.

weight to give that evidence, and reasons for his or her conclusions regarding the evidence. Armstrong v. Sullivan, 814 F.Supp. 1364, 1373 (W.D. TX 1993), citing, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir.1983); Rivera v. Sullivan, 771 F.Supp. 1339, 1351, 1354, 1356 (S.D.NY 1991). Additionally, the ALJ has the discretion to order a consultative examination. Jones v. Bowen, 829 F.2d 524 (5th Cir. 1987). An examination at government expense is not required "unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." Turner v. Califano, 563 F.2d 669 (5th Cir. 1977).

The undersigned finds that the evidence does not support the ALJ's conclusion that, if Miguez were to stop abusing drugs, his level of functioning would increase such that he would be able to return to competitive employment. Although the record contains information regarding Miguez's substance abuse problems and Dr. Charles Bramlet at the Pauline Faulk Centre has characterized Miguez as suffering from "personality issues with primary polysubstance abuse,"[56] there is insufficient evidence showing that without drug abuse, Miguez would not suffer from severe and disabling mental health problems.

The record shows that even when Miguez was drug free, he had only slight improvement in his mood, and he continued to be depressed and exhibit negative thoughts.[57] In fact, after a month of in-patient treatment at the Tyler Mental Health Center, he continued to have suicidal ideations, depression, and paranoid delusions.[58] Despite this, the ALJ did not obtain a consultative psychological evaluation, nor did he engage the services of a medical expert to review the evidence and determine whether Miguez's substance abuse was material to his

---

[56] Tr. 150.

[57] Tr. 99-100.

[58] Tr. 88.

obviously lengthy and disabling mental illness. Instead, the ALJ substituted his lay opinion and determined that Miguez's substance abuse was a material factor in his depression and personality disorder, and therefore without substance abuse, Miguez would not suffer serious limitations that preclude him from employment while he is abusing drugs.

The undersigned concludes that the ALJ should have had Miguez undergo a consultative evaluation and he should have consulted a medical expert to determine whether absent Miguez's substance abuse he would continue to suffer disabling mental impairments. Remand is appropriate upon a showing of "good cause," which includes an "inability to make a definitive ruling concerning a claimant's disability based on the record before the court." Ferguson v. Schweiker, 641 F.2d 243, 250, n. 8 (5th Cir.1981). Considering that the record does not contain sufficient information regarding the effects of Miguez's substance abuse and the effects thereof, remand is appropriate.

### *Conclusion*

Considering the foregoing, the decision of the ALJ is **REVERSED** and the case is **REMANDED** for further proceedings in accordance with the foregoing findings.

Signed at Lafayette, Louisiana on _July 14_, 2006.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)